# Cline's Appeal.

106  617
196  301

1. While the general rule is that an executor or administrator who sells on credit the goods and chattels of his decedent, in settling the estate, must take security therefor; yet this does not apply to a sale of goods, made in the ordinary course of a business, which the executor is carrying on, for the benefit of the decedent's estate, in pursuance of an active trust created by the will.

2. A., by his will, appointed B. his executor, and directed that he should have a general supervision of his (A.'s) business for the benefit of the estate.   In pursuance of this trust, in March, 1873, B. sold to C. & Co., about $1300 worth of leather on credit, taking their note therefor in his own name, which he twice renewed without any payments having been made thereon.   Shortly after the last renewal, C. & Co. were found to be insolvent, and nothing was ever recovered on said note.   The auditor reported, that in December, 1872, one K., who had been selling C. & Co. on credit, discovered on inquiry that "they were not responsible, that

their real estate was encumbered to its full value and that the firm was insolvent." There was also evidence before the auditor that A. had sold to C. & Co. on credit shortly before his death; the money for which sale B. had received about the time he sold them the bill of $1300. No suit was ever brought on the note, the parties being irresponsible. After B.'s death, A.'s heirs sought to surcharge his estate with said $1300 and interest on the ground that B. had been guilty of gross negligence in not making such inquiries as would have revealed C. & Co.'s condition, and in not requiring security from them.

*Held,* That in the absence of evidence of what inquiries B. may have made in regard to C. & Co. before this sale, and in view of the above facts, his estate would not be surcharged; the loss being the result of a business risk, entered into by B. in pursuance of the trust and in good faith.

May 20, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

APPEAL from the Orphans' Court of *York county:* Of July Term, 1884, No. 38.

Appeal of Lewis Cline and Carrie Cline, administrators of Andrew Cline, deceased, who was executor of Samuel Grove, deceased, from a decree of said court confirming the report of an auditor—surcharging the estate of the said Andrew Cline, with a certain sum lost to it by his alleged negligence as executor.

Before the auditor, John W. Bittenger, Esquire, appointed to audit the account of Andrew Cline, executor, filed by his administrators, the following facts appeared: Samuel Grove died in August, 1872, leaving a will, which was duly proved on September 4, following, and letters testamentary granted to Andrew Cline, the executor named therein. Grove died possessed of certain real estate, including a tan-yard in the borough of Lewisberry, when he died. By his will he provided, *inter alia,* as follows:

"I Will and direct the Tan Yard and farm, be controlled by my Executor until such time as my Son John shall have become twenty One years (21) old. Then my Executor and my two sons Henry and John to carry on the tanning business, (the yard to be stocked out of the funds of my Estate,) half of the profits of the Tan Yard and, &c., for the use of my two sons Henry and John. The other half to go into the hands of my Executor — for the use of the other members of my family — to wit, my Wife and my other children. My sons John and Henry to be at an equal expense with my Executor in conducting the business of Tan Yard and farm. I also Wish and Will that John C. Danner may and will still continue in the Yard, and direct affairs under and with the approval of my executor, until such time as circumstances may require a change."

Andrew Cline accepted the trust and assumed the general

supervision of the tan-yard, the practical business of which was conducted by John C. Danner, according to the terms of the will.

In March, 1873, Cline sold to J. W. Lescure & Co., of Harrisburg, a bill of leather from the tan-yard, amounting to $1364.52, and took the firm's note therefor, in his own name. This note was twice renewed without any payments being made on it, the last renewal being on July 1873. Immediately after the last renewal of the note, it became known that Lescure & Co. were insolvent and their real estate was sold by the sheriff, without realizing enough to pay the judgment liens against the same. These liens existed in March, 1873, when the leather was sold to said firm. No suit was ever brought on the note.

One Clinton Keister, a witness before the auditor, testified that he had been accustomed to sell leather to Lescure & Co. on credit up to December, 1872, when he discovered that they were not responsible, and that their real estate was encumbered to its full value.

After Cline's death his administrator filed his final account as executor of Samuel Grove, and the latter's heirs sought to surcharge Cline's estate with the $1364.52 and interest, claiming that the facts above set out showed culpable negligence on his part in selling Lescure & Co. leather on credit, without security. This final account included an account filed by Cline himself in 1877. The accountants denied such negligence on Cline's part and claimed that Grove himself sold Lescure & Co. on credit up to the time of his death. In proof of this they referred to Cline's account in which he charged himself, in 1873, with $544.35 "cash received from Lescure & Co."

The auditor reported, *inter alia*, as follows : "It was argued by Mr. Spangler, counsel for the accountants, that Samuel Grove, in his lifetime, sold to these parties on credit. The evidence does not establish this position. It is true that the accountants charged themselves, for the executor, in the account filed, with $544.35 from J. W. Lescure & Co., in 1873, but it does not appear who sold them this bill or on what terms it was sold. If Andrew Cline had made proper inquiries in the spring of 1873, he would have discovered the facts ascertained by Mr. Keister, that Lescure & Co. were insolvent and wholly irresponsible. In neglecting to make such inquiries, and in taking the note of the firm, without security payable to himself, individually, the auditor is of the opinion that the executor, Andrew Cline, was guilty of gross negligence, such as, in law, makes him responsible for the loss. Accord-

ingly he, or his estate is surcharged with the amount, as of date May 25, 1873, with interest for ten years."

Exceptions filed to this report, were dismissed by the court, GIBSON, J. delivering the opinion, and a decree entered confirming the same absolutely.    Thereupon the accountants, Lewis Cline and Carrie Cline, took this appeal, assigning for error the decree of the court.

*E. W. Spangler*, for the appellants.— The auditor erred in holding that there is no difference in the degree of liability of a trustee for the proceeds of a decedent's estate sold at public or private sale, or of goods owned by a decedent at his death; and those manufactured under the direction of his will after his decease.  Where a trustee carries on a business for a decedent under his will, the court will not charge him with losses incurred in such business, where he acts in good faith and according to his best judgment: Garrett *v.* Noble, 6 Simons, 505; Poole *v.* Munday, 103 Mass., 174; Forbes *v.* Ross, 2 Cox, Ch., 116; Bowker's Estate, 5 W. N. C., 493; McNair's Appeal, 4 Rawle, 148.    Under the circumstances of this case, the fact that Lescure & Co.'s note was taken by Cline in his own name, is not material: Commonwealth *v.* McAlister, 4 Casey, 485.  Nor was the executor bound to sue on the note forthwith: Neff's Appeal, 7 P. F. S., 97; Konigmacher *v.* Kimmel, 1 Penrose & Watts, 213.    Keller's Appeal, 8 Barr, 288.  A suit by the executor would not only have proved useless, but precipitated the insolvency.

*W. C. Chapman*, for the appellee.

Mr. Justice PAXSON delivered the opinion of the court, June 9, 1884.

The error of this case consists in the misapplication of well-understood principles of law.    It is undoubtedly true that the measure of diligence and care required of a trustee is precisely that which a man of ordinary prudence would practice in case of his own estate: Fahnestock's Appeal, 41 Leg. Int., 46.  So, where an executor or administrator sells the goods and chattels of his decedent, the general rule is that he must take security or the sale is at his own risk: Konigmacher *v.* Kimmel, 1 P. & W., 207; Johnston's Estate, 9 W. & S., 107; Swoyer's Appeal, 5 Barr, 377.

In the case in hand the testator directed that his tan yard and farm " be controlled by my executor until such time as my son John shall have become twenty-one years old.  Then my executor and my two sons, Henry and John, to carry on the tanning business (the yard to be stocked out of the funds of

my estate), half of the profits of the tan yard &c. for the use
of my two sons, Henry and John; the other half to go into
the hands of my executor for the use of the other members of
my family, to wit, my wife and my other children; my sons,
John and Henry, to be at an equal expense with my executor
in conducting the business of tan yard and farm.  I also wish
and will that John C. Danner may and will still continue in
the yard, and direct affairs under and with the approval of my
executor until such time as circumstances may require a
change. . . . . My friend, Andrew Cline, I appoint my exec-
utor."

The said Cline took upon himself the execution of this
trust.  He appears to have been an old man, and there is
nothing to show that he had any knowledge of the tanning
business.  In 1877 he filed an account in which was included
the administration of his trust for the first five years.  The
present account was filed by his administrators after his
death.  This contention grows out of an attempt to surcharge
his estate with the amount of a bill of leather, $1,304.52,
which in 1873 he sold to the firm of J. W. Lescure & Co. on
account of Samuel Grove's estate.  It was urged on behalf of
the widow and children of Samuel Grove that the sale was
improvident; that Lescure & Co. were at that time insolvent,
and that with reasonable diligence and proper inquiry on the
part of the executor he would have ascertained that fact; and
that he should have sold the leather for cash or taken security
for the payment of the money.

The auditor's finding of facts was meagre and not entirely
satisfactory.  He finds, however, that the firm of J. W. Lescure
& Co. were insolvent in August, 1873, at which time the real
estate of one member of the firm was sold by the sheriff.  He
finds further that "about December, 1872, Clinton Keister, a
witness before the auditor, who had been selling leather to
said firm, discovered on inquiry that they were not responsi-
ble, that their real estate was incumbered to its full value, and
that the firm was insolvent."

This bill was sold in March, 1873.  There was no finding
that at that time the credit of the firm of Lescure & Co. was
not as good as during the lifetime of the testator.  It does not
appear to have been at any time a firm doing a large business,
or having a large capital and credit.  Yet the testator, shortly
before his death, appears to have dealt with it.  Andrew
Cline, the executor, charges himself in his first account with
$544.35 received for leather from the firm.  There is no direct
proof that this leather was sold by the testator, yet, as it was
not pretended that it had been sold by the executor, we
have a right to assume, what all the probabilities of the case

indicate, that this sale was made by the testator. If the leather sold by the executor in March, 1873, had been manufactured by the testator, and had come into the hands of his executor for the purpose of closing up his estate, there would have been more reason for holding the estate of the executor responsible for the loss upon the sale. In such case it might have been his duty to take security. But the testator directed his business to be carried on for an indefinite period for the benefit of his estate. He may have thought he was acting wisely in doing so. As a general rule, such provisions in wills result disastrously, and this case is not an exception to the rule. It has certainly impaired the estate. But we must be careful not to throw the consequences of the testator's folly upon the executor unless it clearly appears that he deserved to be so punished.

The position that the executor should have taken security for the leather is not worth discussing. With the sharp competition of business it would be unreasonable to require security from every customer. There would be no sales upon such terms. This executor was to carry on the business in the same way the testator had been carrying it on, and in no other manner. If it resulted in a gain the estate would have the benefit of it; if in a loss, such loss must fall upon the estate. It would be a harsh rule to put the losses upon one who had no possible participation in the profits.

This loss was a business loss. Looking at it from the light we now have the sale was unwise. Yet we cannot doubt that it was made in perfect good faith. The executor found that his testator had sold the firm leather, and, as before stated, he received the money for one bill of several hundred dollars which had been sold by him. This was about the time the executor sold the bill of March, 1873. Other tanners were then selling the firm, and its general credit and reputation had not been seriously impaired.

Aside from this, it is plain from Samuel Grove's will, that his executor was to have merely a general supervision over the business. It provides that John C. Danner, who appears to have been a brother-in-law of the testator, was to remain upon the premises and direct the business. Danner was there when testator died, and was to remain and manage the business. The testator no doubt had entire confidence in him, and it was this confidence in all probability which influenced the testator to make the provision for continuing the business. That he relied upon his executor, an old man, unacquainted with the tanning trade, to enter into the details thereof, is hardly among the possibilities. The executor had a general supervision, nothing more. And nothing more was possible under

[Inquirer Printing and Pub. Co. v. Rice.]

the circumstances. Without the constant personal care of a practical tanner, no profit could be expected. This the executor could not give without relinquishing entirely his own affairs, and were he disposed even to do that, there is nothing to show that he was competent.

We have no information as to what care, if any, was exercised in making this sale. It may have been made by the executor, or it may have been made by Danner. The executor is now dead. If he were living he might possibly explain the transaction. He may have made inquiries in regard to the standing of Lescure & Co., which to him were satisfactory. No attempt was made to cast this burden upon him until after his death, although there was abundant opportunity to do so before. It would be a harsh rule to charge his estate with the loss of this money now, and the law does not require us to do so.

Under the circumstances, we do not attach much significance to the fact that the note was taken in his individual name. He was carrying on business for an estate, and, to some extent, upon his own credit. Nor is it material that no suit was commenced upon the note. If nothing could have been recovered by means of a suit, it would have been a waste of money. There is nothing to show that the money could have been collected, and the renewal of the note was within the executor's discretion. And his discretion appears to have been exercised in good faith.

We are of opinion that the court below erred in surcharging the estate of Andrew Cline, deceased, with the sum of $2,183.23, and in imposing the costs of the audit upon said estate.

> The decree is reversed at the costs of the appellees, and it is ordered that the record be remitted for further proceedings in accordance with this opinion.